No. 26,062.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LABETTE, *Appellee*, v. CARL J. PETERSON, as State Bank Commissioner, *Appellant*.

SYLLABUS BY THE COURT.

BANKS AND BANKING—*Winding Up Affairs—Power of Court to Regulate Expenses*. The provisions of the statute (R. S. 9-130 and 9-204) providing for the winding up of the affairs of insolvent banks, considered, and *held*, the power given to the district court to approve the compensation of the receiver of an insolvent bank, upon the application of an interested party, confers no power upon the court to supervise, regulate, or fix the other expenses necessary in winding up the bank's affairs.

Appeal from the Labette district court; ELMER C. CLARK, judge. Opinion filed May 9, 1925. Reversed.

*E. W. Columbia*, of Oswego, *W. S. Hyatt*, of Parsons, *Frank Doster*, and *J. E. Addington*, both of Topeka, for the appellant.

*Payne H. Ratner,* county attorney, and *Charles H. Cory,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

Hopkins, J.: This controversy involves the question as to whether the district court has jurisdiction to regulate or fix the expenses in- cident to winding up the affairs of an insolvent bank, other than the compensation of the receiver.

The bank commissioner, F. H. Foster, took charge of the following banks on the dates indicated, and appointed B. V. Curry, receiver: The C. M. Condon State Bank of Oswego, March 15, 1922; The Farmers and Merchants State Bank of Chetopa, September 18, 1922; The Labette State Bank of Labette, October 3, 1922. When Mr. Foster retired, and Carl J. Peterson succeeded him as bank commis- sioner, Mr. Curry resigned, and Lewis Wilson was appointed re- ceiver for the banks named, and also for The Citizens State Bank of Bartlett, January 1, 1924. Late in the administration of the affairs of these banks, the plaintiff filed an application in the district court, alleging that the county had certain funds on deposit in the banks in charge of the state bank commissioner, Carl J. Peterson, and that, "Your petitioners respectfully allege that the funds of said banks now in the hands of said bank commissioner are being wrongfully disbursed in compensation for receiver's and attorney's fees." No other pleading was filed. The court thereupon entered upon an in- vestigation of the affairs of the banks named, together with two other banks beyond the limits of Labette county, at the conclusion of which it entered an order fixing the salaries or compensation of the receivers, "assistant receivers," "assistants," and attorneys. The defendant appeals, contending that the court had no authority to ap- prove or disapprove anything except the compensation of the re- ceiver; that the court had no power to go back of allowances which were made and paid prior to the time of the filing of the application, because it was shown that the statements concerning the receiver- ships and their expenses had been filed, as provided by law, regularly in the office of the district clerk, and no one complained thereof or asked that they be approved or disapproved until the filing of the application in this case; that the court had no power to determine questions concerning banks located outside the court's judicial dis- trict; that the allowances made by the bank commissioner and the receiver were fair and reasonable, and fully justified.

The statute governing the appointment of receivers for insolvent banks, in part, reads:

"If, upon examination by the state bank commissioner or his deputy, or from any report made to the bank commissioner, it shall appear that any bank is insolvent, or has wilfully violated any requirement of the act to which this is amendatory, it shall be the duty of the bank commissioner to immediately take charge of such bank and all property and effects thereof. The bank commissioner may appoint a special deputy bank commissioner to take charge of the affairs of an insolvent bank temporarily until a receiver is appointed; such deputy shall qualify, give bond and receive compensation the same as the regular deputy; such compensation to be paid by such bank or allowed by the court as costs in case of the appointment of a receiver: *Provided,* That in no case shall any bank continue in charge of such special deputy for a longer period than six months. Upon taking charge of any bank, the bank commissioner shall, as soon as possible, ascertain by a thorough examination into its affairs, its actual condition; and whenever he. shall become satisfied that such bank cannot resume business or liquidate its indebtedness to the satisfaction of all its creditors, he shall forthwith appoint a receiver and require of him such bond and security and allow him such reasonable compensation as he deems proper; such compensation to be subject to the approval of the district court of the county in which such bank is located, upon the application of any party in interest." (R. S. 9-130.)

Another section of the statute provides that:

"When any bank shall be found to be insolvent by the bank commissioner, he shall take charge of such bank, as provided by law, and proceed to wind up its affairs," etc. (R. S. 9-204.)

It appears that the bank commissioner conducted the winding up of these banks by appointing one receiver for all, and the receiver had general supervision and had his office in the bank commissioner's office. The receiver attended to the issuance of receiver's certificates and guaranty fund certificates upon the filing of proofs of claim, and made trips to the localities of the failed banks, as necessity required. His salary was made up of a small allowance from each bank under his supervision. Another man termed "assistant receiver" was in immediate charge of each bank. As an instance, when the bank commissioner appointed Mr. Curry receiver of the C. M. Condon & Company State Bank, Curry employed Mr. W. W. Patterson as his assistant at a salary of $175 per month, and one clerk, a young woman, at $65 per month. When the Labette State Bank closed, Mr. Curry was appointed receiver with Mr. Patterson as "assistant" at $125 per month, and Mr. DeVilbiss at $100 per month, and when the Farmers and Merchants State Bank of Chetopa closed, Mr. Curry was likewise appointed receiver and Mr.

Walter W. Olson "assistant" at a salary of $250 per month and one clerk at $100 per month. Mr. Elmer W. Columbia of Oswego, Kan., was employed as attorney for all these receiverships.

This arrangement continued until Mr. Curry resigned upon the appointment of Mr. Carl J. Peterson as bank commissioner, when Mr. Lewis Wilson, of Topeka, was appointed to take the place of Mr. Curry, and the other arrangements continued until Mr. Peterson further consolidated the receiverships and appointed Mr. F. A. McElroy, of Oswego, Kan., as assistant receiver of the C..M. Condon & Company State Bank, the Farmers and Merchants State Bank of Chetopa, and the Labette State Bank, and also as assistant receiver of the Farmers State Bank of McCune. This dispensed with the services of three individuals—Messrs. Patterson, DeVilbiss and Olson. Mr. McElroy received a salary of $100 per month from each of the four receiverships, and Mr. Olson was retained as his assistant at a salary of $62.50 from each of the receiverships. Mr. McElroy thus received from the three receiverships in Labette county and one receivership in Crawford county the sum of $400 per month, in full, and in consideration thereof he furnished two automobiles which were used by himself, by his assistant, Mr. Olson, and by Mr. Columbia. Mr. McElroy was further retained as receiver of the Hollowell State Bank at a salary of $150 per month. Under the consolidated receiverships the expense was thus reduced as follows: In the Chetopa bank from $350 per month to $162.50; in the Condon bank from $240 per month to $162.50, and in the Labette bank from $225 per month to $162.50. The defendant bank commissioner testified that he made these changes after full investigation and fixed the salaries as he believed he had a right to do.

The sections of the statute heretofore cited provide that upon a bank becoming insolvent, the commissioner shall take charge and "proceed to wind up its affairs" (R. S. 9-204) and that, upon examination by the commissioner, or report made to him that a bank appears to be insolvent or to be violating the law, the commissioner shall, through a special deputy, take charge of the bank and all its property and affairs until a receiver may be appointed (R. S. 9-130). The special deputy's compensation is the same as that of a regular deputy, and is paid by the bank, or allowed by the court, as costs, in the event a receiver shall be appointed. The compensation of a regular deputy bank commissioner is fixed by statute; therefore, the court has no discretion in fixing the amount. "Allowed by the court,"

means that the compensation fixed by the statute in such cases is ordered paid by the court. The statute provides that the bank commissioner shall ascertain as soon as possible the actual condition of the bank, and if satisfied that it cannot resume business or liquidate its affairs to the satisfaction of its creditors he shall appoint a receiver under bond and security, and allow him such reasonable compensation as he deems proper, subject to the approval of the court, if any interested person makes application to the court therefor. Thus it appears that the court may review the commissioner's allowance only in the event of an application made by an interested party. If the holders of more than fifty per cent of the claims against the bank agree on a receiver, the commissioner must appoint the person selected, and such creditors may contract with him as to his compensation and charges. "Charges" undoubtedly means his expenses. A receiver selected by the creditors must report "all his acts and proceedings" to the commissioner. There is not, therefore, as to the compensation and charges of the receiver chosen by the creditors, any power of revision by the court. In such a case the creditors themselves determine that matter.

The language of the statute, "The receiver, under the direction of the bank commissioner, shall take charge of such bank and its assets and wind up the affairs and business thereof," indicates an exclusive power in the bank commissioner, except as otherwise provided. The receiver winds up the business under the direction of the bank commissioner. He cannot liquidate bank assets and wind up bank affairs without incurring expense, sometimes by litigation with incident attorneys' fees, court costs, traveling expenses, etc. It would be impracticable for the bank commissioner to give the receiver directions as to what to do and what not to do in matters involving expense, if required, personally, or through his receiver, to be in constant consultation with the court, or afterwards submit his expense account to the court's discretionary allowance. The receiver must also, as the bank commissioner may direct, make payments to the creditors.

The statutory scheme of bank supervision appears to have been constructed on the idea of plenary power in the bank commissioner to take charge of all the affairs of an insolvent bank, and, unhampered by the interference of other authorities, to liquidate its assets and pay its depositors and other creditors. Discretion as to

methods and agencies for reaching this end is therefore largely vested in the commissioner. The principle was recognized in *Jeffries v. Bacastow,* 90 Kan. 495, 135 Pac. 582, and approved in *Barrett v. Skalsky,* ante, p. 162, 233 Pac. 1043. In the Jeffries case it was contended that the appointment of receivers for insolvent banks was a judicial act, which a court only could perform, and hence, that a receiver appointed by the bank commissioner could not lawfully bring suit on his own initiative to collect bank assets. The court held otherwise, directing attention to the broad powers conferred by the statute on the commissioner and his receiver. See authorities cited in *Jeffries v. Bacastow,* supra. Also, *State, ex rel., v. Norman,* 86 Okla. 36; *State, ex rel., v. Quigley,* 93 Okla. 296, 220 Pac. 918; *Koch v. Missouri-Lincoln Trust Co.,* 181 S. W. 44 (Mo.); *Hall v. Tyler County* (Tex. Civ. App.), 247 S. W. 582; *Valley Bank v. Malcolm,* 23 Ariz. 395-404, 204 Pac. 207. Some authorities construing the National Bank act (6 Fed. Stat. Ann. p. 850, § 5234) providing for the winding up of insolvent national banks are: *In re Chetwood,* 165 U. S. 443, 41 Law Ed. 782; *In re Earle,* 92 Fed. 22; *Snohomish County v. Puget Sound Nat. Bank,* 81 Fed. 518; *Rankin v. Miller,* 207 Fed. 602.

The conclusion here reached takes nothing from the powers of a court of general jurisdiction to make a judicial inquiry touching the dissipation of a bank's assets by or through a receiver, his clerks, assistants, attorneys, etc., in a proper proceeding for that purpose. No such case is presented here.

The judgment is reversed and the cause remanded with directions to set aside the order of the court fixing the compensation or expenses of others than the receiver.